IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

WAGNER EQUIPMENT CO.,

Plaintiff,

vs.                                                          Civ. No.  07-880 JH/RLP

BENORE LOGISTIC SYSTEMS, INC. and
MILLENIUM TRANSIT SERVICES, LLC,

Defendants.


### MEMORANDUM OPINION AND ORDER

This matter is before the Court on the *Motion for Summary Judgment* [Doc. No. 83] by Defendant Benore Logistic Systems, Inc. ("Benore").  In that motion, Benore seeks entry of summary judgment in its favor on Plaintiff's claim against it for breach of contract.  The Court has reviewed the arguments, authorities, and the evidence presented by the parties.  For the reasons set forth more fully below, the Court concludes that there are genuine issues of material fact, and for that reason Benore's motion should be denied.

### STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  "The evidence is viewed, and reasonable inferences are drawn from the evidence, in the light most favorable to the nonmoving party." *Verdecia v. Adams*, 327 F.3d 1171, 1174 (10th Cir. 2003) (quotation omitted).  Thus, for purposes of this motion, the Court will view the evidence in the light most favorable to Plaintiff Wagner Equipment Co. ("Wagner").

## FACTS

Unless otherwise noted, the following facts are undisputed.

Wagner is the exclusive distributor of Caterpillar engines for New Mexico, including selling and renting used Caterpillar engines. Millenium Transit Services ("MTS") is a bankrupt transit bus manufacturer located in Roswell, New Mexico. Benore is a full service supply chain management company that is involved in transportation management, warehouse distribution, and plant services. The dispute in this case arises from the proposed purchase of 286 Caterpillar C9 engines by MTS from Wagner. Though some of the details of Benore's role in this transaction are in dispute, it is apparent that Wagner and Benore agreed that Benore would transport the engines from the Caterpillar production facility, store them, and then transport them to MTS at an agreed time. According to Wagner, Benore breached that agreement by delivering engines to MTS without authorization from Wagner, resulting in financial damages to Wagner.

On June 16, 2006, MTS and Wagner mutually executed a purchase order containing terms and conditions for the purchase by MTS of 286 Caterpillar C9 engines from Wagner. MTS was planning to incorporate the engines into buses it was manufacturing for the New Jersey Transit Authority. The purchase order required that MTS receive 130 of the engines by November 6, 2006, and that "[d]elivery is to be in accordance with Buyer's [MTS'] written releases." However, Benore was not a party to the purchase order, and Benore had no contractual relationship with MTS.

There is a factual dispute regarding the way in which the relationship between Wagner and Benore began. According to Benore, Wagner's representatives said that it had sold engines to MTS, which was behind on its production of buses and therefore could not receive the engines as fast as Caterpillar would make them. Thus, Benore was to act as a "buffer" and store the engines until MTS was ready to accept delivery. However, Wagner disputes this version of events and has come

2

forward with evidence that Wagner simply asked Benore to receive engines from Caterpillar, store them, and then ship them at Wagner's request.  According to Wagner, it did not disclose to Benore its relationship with MTS or any other customer.  In accordance with Rule 56, for the purposes of this motion only the Court must resolve this conflict in favor of Wagner, the non-movant.

In any event, both Benore and Wagner executed a document called a Project Charter that is the only written agreement between these two entities.  Benore drafted the Project Charter and sent it to Wagner for signature.  Such project charters are typically the product of an iterative, back-and-forth exchange between the parties until they reach a meeting of the minds, as was the case here. On July 18, 2006, Paul Keener signed the Project Charter on behalf of Wagner and sent it back to Dave Benore, who signed on behalf of Benore in South Carolina on July 26, 2006.  It is the only written agreement signed by the parties, and according to David Benore, they did not sign a more formal written contract because the intended project was very simple and was only intended to last a couple of months.  The Project Charter is divided into sections, each containing one or more bullet points.[1]  Under the section "Objective," the Project Charter states, "Provide effective coordinated transportation and warehousing services for C9 engines."  Another section titled "Operational Approach" contains three subsections: Transportation, Receiving & Storage, and Shipping.  There are six items listed under Shipping, the first of which states "Receive order from Wagner Equipment Co. via email or fax."  The remaining five items under "Shipping" involve creating an order for authorized shipment under Benore's internet-based inventory tracking system ("IIM"), moving the engines to the staging area, loading the engines into a trailer, and closing the order.  Under the

---

[1] Neither Wagner nor Benore has provided the Court with an entirely legible copy of the Project Charter.  In fact, inexplicably it appears that Benore has reduced the size of most of the documents it has submitted as exhibits, including deposition testimony, rendering them extremely difficult to read.

section titled "Assumptions," it states that (1) the engine inventory at Benore would build up from August 1, 2006 to December 31, 2006, with a total of 288 engines coming into Benore's warehouse, and (2) the inventory by December 31, 2006 would be between 100 and 140 engines. Under the section titled "Operational Approach," the Project Charter states that Wagner would provide Benore with "12 hours advance pickup notification," but as actual operations developed, Wagner never provided Benore with this notification. The Project Charter does not mention MTS. In addition, Benore presented evidence that when it has a customer who owns goods and there is a third party who is an end-user of those goods, it is Benore's normal business practice to release items to that end-user at the request of either its customer or the end user. However, this business practice is also not mentioned in the Project Charter.

Three shipments totaling ninety engines were eventually released by Benore to MTS' carrier for shipment to MTS' plant in Roswell, New Mexico. MTS made an initial request for ten engines. On August 10, 2006, Robert Tucker of MTS emailed Debra Gray of Wagner, stating "ABF will pick up 10 engines today." Only minutes later, Gray forwarded the message to Benore, stating "[p]er our customer, ABF will pick up 10 engines today." Gray then identified the serial numbers of ten engines for Benore to load on the ABF truck. ABF presented Benore with a Bill of Lading, and the ten engines left Benore's warehouse that day. The following day, August 11, Benore confirmed via email to Wagner the shipment and release of the engines to MTS.

By October 25, 2006, it was clear that MTS was having trouble paying for the engines it had ordered. On that date, Wagner sent MTS a letter reciting the fact that, due to its inability to obtain security from MTS, it had been able to offer MTS only a $300,000 open line of credit on net 15 day terms. The letter confirms Wagner's understanding that MTS did not have the ability to pay for future engines until it was paid by the New Jersey Transit Authority. Wagner's letter states that

further delivery of engines has been delayed at MTS' request, as under the purchase order 120 engines were to be delivered by October 20, 2006, yet MTS had only requested and paid for ten engines. Wagner informed MTS that it had incurred substantial holding and storage costs due to delays in delivery, and that it needed to deliver and receive payment for 110 engines immediately. Wagner stated that it would not agree to any further delays in payment and delivery. There is no evidence that at this time Benore was aware of any of these issues between Wagner and MTS.

Two days later, on October 27, 2006, Vicki Hobbs of MTS emailed Benore requesting the release of forty engines. Benore complied, and the shipment left Benore's warehouse on the same day. Unlike the first release of ten engines, Wagner did not send Benore a request or authorization for release of engines to MTS on this occasion. As with the first release of engines, however, Benore did send a shipment notification email to Paul Keener on the next business day. Keener received it, but did not pay attention to it because he had instructed Carolyn Wilson, logistics coordinator at Benore, to direct all such communications to another Wagner employee, Debra Gray. Wilson told Keener via email that this would be done, and Keener believed that Gray was receiving these emails and managing all engine transfers. Therefore, Keener did not believe that it was necessary for him to read all the emails he received from Benore. Unbeknownst to Keener, Benore was not in fact copying Gray on those emails. On November 7, 2006, MTS requested the release of another forty engines from Benore, and again there was no accompanying request or authorization from Wagner.[2] Benore released the engines to MTS' carrier on November 8, 2006. That same day,

_____

[2] Wagner and Benore dispute whether or not Wagner had authorized MTS to request shipment of engines from Benore, but neither comes forward with competent evidence on that question. Wagner comes forward with evidence that Dave Benore was not aware that Wagner had granted such authorization, and that no one from Wagner ever told Carolyn Wilson, logistics coordinator for Benore, that MTS had such authority. However, this does not establish that it was never given, only that if it was, these two individuals were unaware of it. Similarly, Benore

Keener received another shipment notification email, which he also did not read.  Keener conceded that had he read the email he would have been able to prevent MTS from receiving that shipment of engines.  All twenty-three engines that are at issue in this litigation were in the November 8, 2006 shipment.

It is undisputed that at least three Wagner employees had access to Benore's internet-based inventory system, known as IIM, and that if they had logged onto that system they would have immediately discovered the October and November releases of engines to MTS.  The IIM website, which was referenced in the Project Charter[3], provided real-time shipping and receiving information regarding the engines.  However, nothing in the Project Charter obligates Wagner to monitor the movement of the engines using IIM.  Similarly, it is undisputed that Wagner never informed Benore that there were credit or payment issues with MTS, or that Benore was supposed to store the engines until MTS paid for them.[4]

In late November or early December of 2006, Kurt Ehlert of Wagner contacted Dave Benore for the first time about his company's allegedly improper release of the eighty engines to MTS in October and November of 2006, and then Ehlert confirmed the conversation with a letter dated December 4, 2006.  At some point, though the evidence is not clear as to precisely when, Dave Benore suggested to Ehlert at Wagner that he be permitted to recover the engines from MTS and

comes forward with testimony and a letter from Vicki Hobbs of MTS stating that her supervisor told her that the agreement or understanding between MTS and Wagner was that MTS could request shipment of engines.  However, this evidence is inadmissible hearsay.

[3] It states that Benore will "provide online visibility for C9 engines inventory via BLS' proprietary Inventory In Motion (IIM) system."

[4] What is in dispute is the legal question of whether Wagner had a duty to inform Benore of the details of its relationship with its customer, MTS.  That question is not raised directly by the present motion for summary judgment, and therefore the Court will not address it.

return them to Wagner, and Wagner declined the offer.  What is clear is that during December of 2006 and January and February of 2007, Wagner and MTS continued to work together to resolve the situation and arrange payment for the engines, and MTS assured Wagner that it fully intended to pay Wagner for the eighty engines.  The two companies attempted to negotiate a new arrangement involving a letter of credit with the New Jersey Transit Authority that would allow MTS to pay Wagner.  However, no such agreement was reached.  Benore was not a party to those negotiations.

In January of 2007, Dave Benore began checking in with Ehlert regarding the status of the negotiations between Wagner and MTS.  Ehlert told Benore that their negotiations to enable MTS to pay Wagner for the engines were in the "home stretch," and that he hoped to have a resolution by the end of the week.  However, no such resolution was reached at that time.  Dave Benore continued to contact Ehlert regularly regarding the status of Wagners' discussions with MTS.

In March of 2007, Dave Benore began contacting Wagner in an effort to get authorization to recover the eighty engines.  According to his testimony, each time he was told that the negotiations were progressing, and he was left with the impression that Wagner's goal was payment for the engines, not the return of the engines.  In an email dated August 6, 2007, Ehlert authorized MTS to release 57 engines to Benore for transport to South Carolina, which MTS confirmed by an August 15, 2007 letter to Dave Benore.  On August 21, 2007, Dave Benore arrived at MTS' plant to recover the fifty-seven engines he was authorized to recover.  He inventoried and photographed the engines, and then supervised the loading of the engines for their return to Wagner.  Thus, twenty-three engines remained with MTS, and those engines are the subject of this litigation.

There is a fact dispute as to whether those twenty-three engines could have been recovered and returned to MTS.  Dave Benore testified that all eighty engines, including these twenty-three, were capable of being recovered and returned to Benore's warehouse.  On the other hand, Wagner

has come forward with evidence that the engines were in various stages of production, were used and damaged, and that engines not in pristine condition were of lesser value and unsuitable for return.  After returning to South Carolina, Dave Benore remained in regular contact with MTS regarding the return of the engines, as well as the status of its attempts to pay for them.

On September 6, 2007, MTS informed Benore that the twenty-three engines would be consumed by a purchase order from Texas A&M University that it expected to receive the following week.  That same month, Wagner filed this lawsuit against Benore for its alleged breach of the Project Charter, and later added breach of contract claims against MTS.  Benore counterclaimed against Wagner for unjust enrichment and misrepresentation, and asserted a subrogation cross-claim against MTS.  Despite the filing of the lawsuit, MTS anticipated that it would pay Wagner for the engines upon receipt of the down payment from Texas A&M.  Eventually, MTS received the Texas A&M purchase order on October 25, 2007, though the purchase order for another fifteen buses was not issued until December 18, 2007.  Despite these purchase orders, MTS never remitted payment to Wagner.

In January of 2008, Wagner, Benore, and MTS entered into a Settlement Agreement.  It provides that in the event that MTS pays certain sums to Wagner in exchange for DPX Filters and for the twenty-three engines at issue in this case, then all parties would fully release each other from all claims and dismiss this lawsuit.  Furthermore, the Settlement Agreement provides that it will be governed by and interpreted in accordance with New Mexico law.  However, MTS did not remit all required payments to Wagner, thereby breaching the Settlement Agreement.  On August 19, 2008, Magistrate Judge Richard Puglisi recommended granting Wagner's motion to enforce settlement agreement.  On September 10, 2008, counsel for MTS filed a notice in this case stating that on August 29, 2008, MTS had filed for Chapter 11 bankruptcy.  On October 1, 2008, the undersigned

8

judge adopted Judge Puglisi's recommendation, thereby awarding judgment in favor of Wagner against MTS. That judgment is presumably a subject of MTS's bankruptcy proceeding.

## DISCUSSION

## I.    CHOICE OF LAW

A federal court must apply the choice-of-law rules of the forum state in which it sits. *See Memorial Hosp. of Laramie County v. Healthcare Realty Trust Inc*., 509 F.3d 1225, 1229 (10th Cir. 2007). The Court therefore applies New Mexico choice-of-law principles. In New Mexico, the general rule for contracts is *lex loci contractus* – the law of the place of contracting controls. *See Ferrel v. Allstate Ins. Co.*, 144 N.M. 405, 421, 188 P.3d 1156, 1172 (2008); *Eichel v. Goode*, Inc., 101 N.M. 246, 251, 680 P.2d 627, 632 (Ct. App. 1984)(quoting *Merriman v. Harter*, 59 N.M. 154, 280 P.2d 1045 (1955)). "A contract is made 'at the time when the last act necessary for its formation is done, and at the place where the final act is done. . . .' The place where the final act is done determines the applicable law for the interpretation of the contract." *Eichel v. Goode, Inc*., 101 N.M. 246, 251, 680 P.2d 627, 632 (Ct. App. 1984)(quoting *Merriman v. Harter*, 59 N.M. 154, 280 P.2d 1045 (1955)). Thus, a contract is generally made at the place where the last signature is affixed. *State Farm Mut. Ins. Co. v. Conyers*, 109 N.M. 243, 248, 784 P.2d 986, 991 (1989).

In this case, it is undisputed that Paul Keener signed the Project Charter on behalf of Wagner and then sent it to Dave Benore, who signed it in South Carolina on July 26, 2006. Benore's was the final signature on the document. Thus, the last act necessary for the formation of the agreement was Benore's signature in South Carolina. Under *lex loci contractus*, South Carolina law applies to the interpretation of the contract.

Despite the clear result dictated by New Mexico's choice of law rules for contracts, Wagner

advocates the application of New Mexico law.  Relying upon an opinion by Judge James Browning in *City of Raton v. Arkansas River Power Auth.*, 08cv026 JB/WDS, Doc. No. 130 (D.N.M. Mar. 12, 2009), Wagner argues that the Court should not adhere to the *lex loci contractus* rule, but rather "apply additional considerations, such as policy, when a more flexible approach proves necessary." Doc. No. 112 at 14-15.  However, in *City of Raton*, there was no evidence in the record regarding the formation of the contract from which the place of contracting could be determined.  *City of Raton*, at 24.  As a result, the court deemed it necessary to apply a more flexible approach and to consider policy issues in reaching its decision on the choice of law issue.  That is not the case here, where the record contains undisputed information about where the contract was formed.

Wagner also argues that the Court should apply New Mexico law because the Settlement Agreement reached by the parties requires the application of New Mexico law, and according to Wagner this action is one to enforce that agreement.  The Court disagrees.  Wagner does not allege, nor does it appear, that Benore has breached any duty to Wagner under the Settlement Agreement.  Thus, it is not the Settlement Agreement that Wagner seeks to enforce, but rather the Project Charter.  That is the contract that Benore violated, according to Wagner, and which it seeks to enforce in this case.  Thus, the choice of law provision in the Settlement Agreement is not relevant.

Finally, Wagner cites the fact that the engines at issue in this case were shipped to and installed into buses in New Mexico, and all parties have subjected themselves to jurisdiction in the District of New Mexico.   However, Wagner cites no authority to support a conclusion that these factors trump the settled choice of law rules governing the contract itself, and the Court is aware of none.  Accordingly, South Carolina law applies to the Project Charter.

## II.      BREACH OF CONTRACT

There does not appear to be any dispute between Wagner and Benore that the Project Charter constitutes an enforceable contract to be interpreted and applied to determine their respective obligations.  Instead, the parties differ on the meaning and interpretation to be given to the Project Charter.  The threshold question to be addressed is whether Benore breached the contract with Wagner by releasing the engines upon request from MTS, without authorization from Wagner.  For its breach of contract claim against Benore, Wagner relies upon the provision in the Project Charter which states: "Receive order from Wagner Equipment Co. via email or fax."  According to Wagner, Benore was contractually bound to ship engines to MTS only after receiving an emailed or faxed authorization from Wagner.  Benore, on the other hand, argues that the Project Charter does not require that engines be released only upon Wagner's written instruction, and that Wagner's conduct shows that the parties did not intend for the Project Charter to contain such a limitation.

### A.      South Carolina Law of Contracts

As explained above, South Carolina law governs the questions of how to interpret the contract in this case.   The foremost rule of contract interpretation is that courts "must give effect to the intentions of the parties by looking to the language of the contract."   *Moser v. Gosnell*, 334 S.C. 425, 430, 513 S.E.2d 123, 125 (Ct. App. 1999) (citing *Conner v. Alvarez*, 285 S.C. 97, 101, 328 S.E.2d 334, 336 (1985)).  "To discover the intention of a contract, the court must first look to its language—if the language is perfectly plain and capable of legal construction, it alone determines the document's force and effect."  *Ecclesiastes Production Ministries v. Outparcel Assocs., L.L.C.*, 374 S.C. 483, 498, 649 S.E.2d 494, 501 (Ct. App. 2007) (citing *Superior Auto. Ins. Co. v. Maners*, 261 S.C. 257, 263, 199 S.E.2d 719, 722); *Ellie, Inc. v. Miccichi*, 358 S.C. 78, 93, 594 S.E.2d 485, 493 (Ct. App. 2004) ("If its language is plain, unambiguous, and capable of only one reasonable

interpretation, no construction is required and the contract's language determines the instrument's force and effect."). If practical, documents will be interpreted to give effect to all of their provisions. *Ecclesiastes*, 374 S.C. at 498, 649 S.E.2d at 502 (citations omitted); *Brady v. Brady*, 222 S.C. 242, 246-47, 72 S.E.2d 193, 195 (1952).

Whether the language of a contract is ambiguous is a question of law to be determined by the court from the terms of the contract as a whole. *Silver v. Aabstract Pools & Spas, Inc.*, 376 S.C. 585, 591, 658 S.E.2d 539, 542 (Ct. App. 2008). In making this determination, the court must examine the entire contract and not merely whether certain phrases taken in isolation could be interpreted in more than one way. *Id.* "'[O]ne may not, by pointing out a single sentence or clause, create an ambiguity.'" *Id.* (quoting *Yarborough v. Phoenix Mut. Life Ins. Co.*, 266 S.C. 584, 592, 225 S.E.2d 344, 348 (1976)).

> In construing and determining the effect of a written contract, the intention of the parties and the meaning are gathered primarily from the contents of the writing itself, or, as otherwise stated, from the four corners of the instrument, and when such contract is clear and unequivocal, its meaning must be determined by its contents alone; and a meaning cannot be given it other than that expressed. Hence words cannot be read into a contract which import an intent wholly unexpressed when the contract was executed.

*Id.* (quoting *McPherson v. J.E. Sirrine & Co.*, 206 S.C. 183, 204, 33 S.E.2d 501, 509 (1945)).

The primary test of a contract's character is "the intention of the parties, such intention to be gathered from the whole scope and effect of the language used." *Barnacle Broadcasting, Inc. v. Baker Broadcasting, Inc.*, 343 S.C. 140, 147, 538 S.E.2d 672, 675 (Ct. App. 2000). "In ascertaining intent, the court will strive to discover the situation of the parties, along with their purposes at the time the contract was entered." *Ellie*, 358 S.C. at 94, 594 S.E.2d at 493. Parties are governed by their outward expressions and the court is not free to consider their secret intentions.

*Id*. at 94, 594 S.E.2d at 494.

Under South Carolina law, construction of an ambiguous contract is a question of fact. *Skull Creek Club Ltd. P'ship v. Cook & Book, Inc.*, 313 S.C. 283, 286, 437 S.E.2d 163, 165 (Ct. App. 1993). When an agreement is ambiguous, the court should seek to determine the parties' intent. *Ebert v. Ebert*, 320 S.C. 331, 338, 465 S.E.2d 121, 125 (Ct. App. 1995). Any ambiguity in a contract, doubt, or uncertainty as to its meaning should be resolved against the party who prepared the contract or is responsible for the ambiguous language. *Myrtle Beach Lumber Co. v. Willoughby*, 276 S.C. 3, 8, 274 S.E.2d 423, 426 (1981). "The parol evidence rule prevents the introduction of extrinsic evidence of agreements or understandings contemporaneous with or prior to execution of a written instrument when the extrinsic evidence is to be used to contradict, vary, or explain the written instrument." *Redwend Ltd. P'ship v. Edwards*, 354 S.C. 459, 471, 581 S.E.2d 496, 502 (Ct. App. 2003). However, if a contract is ambiguous, parol evidence is admissible to ascertain the true meaning of the contract and the intent of the parties. *Klutts Resort Realty, Inc. v. Down'Round Development Corp.*, 268 S.C. 80, 89, 232 S.E.2d 20, 25 (1977).

## B.     **Ambiguity**

As described above, South Carolina law requires first that the Court determine whether the contract at issue is ambiguous. In this case, the Court finds no ambiguity in the Project Charter. It states, as the first item under the section "Shipping," which lists the events that occur when Benore ships an engine to its final destination, "1. Receive order from Wagner Equipment Co. via email or fax." Benore suggests that this is not the only type of instruction that could trigger shipment of engines by Benore, pointing to the absence of the word "only" in that phrase. Benore contends: "The subject phrase is one of many numbered and bulleted phrases outlining the generalized operational approach for the project. These phrases are not couched as obligations or promises of

13

the Parties.  Instead, the language at issue was intended to be a general description of a process dealing with the overall scope of services, and subject to the course of dealings between the Parties." Doc. No. 84 at 15.  The Court disagrees.  Viewing the Project Charter as a whole, it appears that the parties agreed that a shipment of engines would be triggered by an order from Wagner sent by email or fax.  There is no mention of MTS or any other party that might lend credence to the argument that anyone other than Wagner was authorized to initiate a shipment of engines.  The language is "perfectly plain and capable of legal construction" as required by South Carolina law.  While Benore attempts to couch this phrase as but one option in the operational approach taken by the parties, the plain text of the document does not support that position.[5]  In short, the Court concludes that Benore has failed to show, as a matter of law, that the plain language of the Project Charter does not require written authorization from Wagner before Benore ships engines to a third party.

### C.    Conduct of the Parties

Benore argues that Wagner's conduct under the Project Charter demonstrates that the parties did not intend that only Wagner could authorize Benore's shipment of engines.  First, Benore points to the purchase order between Wagner and MTS, set forth in a document titled "Terms and Conditions."  It provides that "Delivery is to be in accordance with Buyer's [MTS'] written releases. Seller [Wagner] shall not procure, fabricate, assemble, or ship any item except to the extent authorized by Buyer in such written releases."  However, Benore was not a party to this contract between Wagner and MTS, nor is there any evidence that Benore was aware of its terms such that it could have been a factor in Benore's intent in drafting the Project Charter.  Furthermore, while

---

[5]While the Court concludes that the Project Charter is not ambiguous, in the event of the ambiguity the Court would have to construe the document as against Benore, the drafter.  *Myrtle Beach Lumber Co. v. Willoughby*, 276 S.C. 3, 8, 274 S.E.2d 423, 426 (1981).

this evidence may help create a fact issue as to Wagner's intent in forming the Project Charter, it certainly does not demonstrate the absence of such an issue. Next, Benore points to the fact that Wagner sent Benore a complete list of the 288 engines to be stored and shipped, indicating that MTS was the purchaser, but that Wagner never informed Benore of any credit or payment issues with MTS. Again, this does not demonstrate a mutual intent by Wagner and Benore to permit MTS to authorize shipment by Benore, a subject addressed by the Project Charter.

Next, Benore points to the fact that with regard to the first shipment in August of 2006, MTS requested the release of the initial ten engines by emailing Wagner and informing it that "ABF will pick up 10 engines today." Indeed, this communication was consistent with the Terms and Conditions governing the relationship between Wagner and MTS, and by forwarding that message to Benore and requesting the release of ten engines with specific serial numbers, Wagner acted in accordance with its agreement with Benore, the Project Charter. Nothing in this series of events supports a conclusion that Wagner understood that MTS could request the release of engines directly from Benore.

Third, Benore argues that Wagner failed to object timely to the October 27 and November 8, 2006 releases of engines, which were prompted by unilateral requests from MTS to Benore, and regarding which Wagner received notice via emails sent to Paul Keener. Benore also points out that Wagner employees could have logged on to IIM and been notified of the releases in that manner. According to Benore, upon notification of the releases Wagner should have immediately objected, thereby stopping the deliveries before the engines arrived in New Mexico and averting the damages it now seeks to recover. While Wagner admits that Paul Keener received email notification, it also has come forward with evidence that he ignored them because Wagner had instructed Benore to send all such emails to Debra Gray, and that Benore failed to do so. Wagner further argues that

nothing in the Project Charter obligates it to monitor Benore's activities via the IIM system. Viewed in the light most favorable to Wagner, this evidence creates a fact issue as to whether the emails from Benore to Keener constituted sufficient notice of the October 27 and November 8 shipments.

Finally, Benore argues that Wagner's intent to permit MTS to request delivery of the engines is demonstrated by its alleged refusal to allow Benore to recover any of the engines from MTS until August of 2007. According to Benore, if the engines should not have been released to MTS, then Wagner should not have allowed them to remain in MTS' possession. In response, Wagner argues that Benore released the engines without its knowledge, thereby damaging Wagner, and that by seeking payment rather than return of the engines, Wagner pursued the most reasonable and immediate form of mitigation of those damages under the circumstances at the time. Again, there is a genuine issue of material fact here, and therefore summary judgment is not appropriate.

**D.       Effect of the South Carolina Commercial Code**

Benore argues that under Section 36-7-404 of the South Carolina Commercial Code, it cannot be held liable to Wagner. That section provides:

> A bailee who in good faith including observance of reasonable commercial standards has received goods and delivered or otherwise disposed of them according to the terms of the document of title or pursuant to this chapter is not liable therefor. This rule applies even though the person from whom he received the goods had no authority to procure the document or to dispose of the goods and even though the person to whom he delivered the goods had no authority to receive them.

Citing this section, Benore contends that as the bailee of the engines, it acted in good faith and observed reasonable commercial standards in disposing of the goods, i.e. delivering the engines to MTS, in the manner prescribed on the bill of lading it received. It bases its argument that it acted in good faith on its allegation that Wagner informed Benore that the engines were being built for MTS and that Benore was storing them for MTS until it was ready to receive them. As discussed

above, this alleged fact is in dispute.  Benore also relies on the fact that Wagner never informed it, prior to the unauthorized deliveries, that MTS was having problems paying for the engines. Accordingly, argues Benore, under this statute it acted in good faith and cannot be held liable. Benore also contends that it acted according to commercially reasonable standards, and that it was typical for Benore, as bailee, to ship a product to the end-user at their request.  Finally, Benore argues that South Carolina Commercial Code § 36-7-403 authorized its actions.  That statute provides that "[t]he bailee must deliver the goods to a person entitled under the document" unless certain conditions, none of which apply here, are met.  The statute further defines "person entitled under the document" as a holder in the case of a negotiable document, or the person to whom delivery is to be made by the terms of or pursuant to written instructions under a nonnegotiable document.  Here, Benore contends that MTS was entitled to the engines under the non-negotiable bills of lading.  According to Benore, nothing in the Project Charter alters the provisions of the above statutory scheme.

Wagner disagrees, pointing out that the same South Carolina Commercial Code also provides that the parties may alter its provisions by agreement, which occurred here when the parties agreed in the Project Charter that shipment of engines would occur when Benore "[r]eceive[d] order from Wagner Equipment Co. via email or fax."  While the Code sets forth a statutory standard of care for warehousemen such as Benore, it also provides that by agreement the parties may prescribe the standard by which the bailee's performance of its duties of care and reasonableness may be measured.  S.C. Code Ann. § 36-1-102(3) (1962).  According to Wagner, the Project Charter sets forth the standard of care that Benore must exercise with regard to the engines stored in its facility by requiring an order from Wagner via fax or email prior to shipping.

Here too the Court concludes that there is a genuine issue of material fact precluding

17

summary judgment.  Based on the record currently before the Court, it is far from clear that the specific terms of the Project Charter regarding the receipt of an order from Wagner via email or fax did not override the general obligations of a bailee set forth in the South Carolina Commercial Code. Accordingly, the Court will deny the motion for summary judgment under the South Carolina Commercial Code.

## III.    WAIVER OF RIGHTS UNDER THE CONTRACT

Under South Carolina law, "Where one dealing with another has by its course of dealing, through leniency or otherwise, lulled that person into a sense of security, then the one doing those things cannot, when a loss occurs, in order to escape its liability, fall back upon the strict terms of a contract, the terms of which the one liable on the contract has led the other party to believe would not be strictly enforced."  *Satcher v. Woodmen of the World Life Ins. Soc*., 199 S.C. 59, 69, 18 S.E.2d 523, 527-28 (1942).  More recently, in *Provident Life & Accident Ins. Co. v. Driver*, 317 S.C. 471, 478, 451 S.E.2d 924, 928-29 (Ct. App. 1994), the South Carolina Court of Appeals stated that:

> Waiver is the voluntary and intentional relinquishment of a known right. It may be implied from circumstances indicating an intent to waive.  Acts that are inconsistent with the continued assertion of a right may also give rise to a waiver.  Waiver, like estoppel, is an affirmative defense and the burden of proof is upon the party who asserts it.

Benore argues that under South Carolina law Wagner has waived any right it had to seek enforcement of the contract. First, it contends that even if Benore was contractually obligated to have Wagner's written authorization prior to releasing engines, Wagner waived that right by not notifying Benore that it should not have released the engines until thirty-five days after it received notice of the first disputed release.  However, as noted above there is a fact issue as to whether Benore provided Wagner with proper notice of the releases.  Wagner has come forward with

18

evidence that Benore failed to send notification to the employee at Wagner designated to monitor the transaction, thereby depriving Benore or timely notice.  Thus, there is a genuine issue of material fact as to whether Wagner "lulled Benore into a sense of security" as required by South Carolina law.  This fact issue precludes summary judgment in favor of Benore on this aspect of its argument for waiver.  Second, Benore argues that Wagner waived its sole right to authorize the release of engines by negotiating with MTS and reaching a new payment arrangement, rather than simply reclaiming the engines.  Again, there is a fact issue as to the reasonableness of Wagner's actions in choosing to mitigate its damages by pursuing payment rather than reclaiming the engines, as the original goal of the contract was the sale of the engines to MTS and, for at least some period of time, there is at least some evidence to suggest that it Wagner could have reasonably believed that MTS could still pay for the engines.  Finally, Benore argues that Wagner waived its contractual rights by refusing to allow Benore to recover the engines for nearly ten months after the October 2006 release, which would have cured the breach.  Based on this, Benore argues that Wagner waived its right to be the sole entity that could authorize the release of the engines.  Again, however, there is a genuine issue of material fact as to the reasonableness of Wagner's decision to attempt to mitigate its damages in this fashion.  Thus, Benore's motion for summary judgment on grounds of waiver will be denied as well.

## IV.    PROXIMATE CAUSATION OF DAMAGES

Next, Benore argues that it was not the proximate cause of Wagner's damages, which it contends could have been avoided if Wagner had permitted Benore to recover the twenty-three engines at issue back in December of 2006.  It is well-settled under South Carolina law that one injured by breach of contract must take reasonable steps to mitigate the damages flowing from the

breach, and that any damages that could have reasonably been avoided are not the proximate cause

of such breach. *Harper v. Western Union Tel. Co.*, 133 S.C. 55, 61, 130 S.E. 119, 121 (1925). In

order to evaluate what is reasonable in this context, one must apply "rules of common sense and fair

dealing." *Id*. The burden of proving lack of due diligence in minimizing damages is on the party

that breached the contract. *Perry v. Green*, 313 S.C. 250, 255, 437 S.E.2d 150, 153 (Ct. App. 1993).

According to Benore, in order to mitigate its damages all Wagner had to do was accept

Benore's offer to recover the engines, but that Wagner refused in favor of trying to negotiate with

MTS for payment for the engines. Benore contends that it should have been permitted to recover

all 80 engines in August of 2007, which was at least two months before MTS received a purchase

order from Texas A&M that ostensibly would enable MTS to pay for the engines. According to

Benore, Wagner should have permitted it to bring home all 80 engines at that time, but instead it was

"trapped between a rock and hard place" as it helplessly awaited the results of the negotiations

between Wagner and MTS. Doc. No. 84 at 22. Wagner, in turn, disputes Benore's version of

events. Wagner argues that as soon as it learned of Benore's breach of the Project Charter, it

immediately contacted both MTS and Benore and sought to prevent any damage to the engines, and

sought payment from MTS. Wagner points out that its reliance on MTS' representations that it

would pay was reasonable, and that MTS fully intended to pay Wagner for all 80 engines. Wagner

also contends that Benore did not begin discussions regarding the return of the engines until late

March of 2007, four months after it notified of its breach of the Project Charter. There is certainly

a fact issue as to when and whether Benore made that offer prior to March of 2007. As stated above,

the evidence on that point is not clear.

Again, the Court concludes that there are genuine issues of material fact precluding summary

judgment based on the issue of mitigation of damages. The Court does not conclude as a matter of

law that Wagner acted reasonably, or that Benore's actions were not the proximate cause of Wagner's damages.  The Court merely concludes that there are genuine issues of material fact that cannot be resolved on summary judgment.


V.       **ELECTION OF REMEDIES**

It is undisputed that all three parties to the transaction—Wagner, Benore, and MTS—entered into a Settlement Agreement in which MTS agreed to pay Wagner more than $54,000, and in return Wagner would ship MTS fourteen DPX filters, whereupon MTS would pay Wagner almost $559,000 for the remaining twenty-three engines.  Settlement Agreement ¶¶ (I)(1) and (2).  The Settlement Agreement provides that "upon performance" of the above obligations by Wagner and MTS, all three parties would release all of their claims against each other.[6]  Id. ¶ (I)(3).  Benore had no obligation under the Settlement Agreement other than to release its claims against the other two parties after they met their own respective duties.  The clear import of the Settlement Agreement is that if Wagner and MTS did not meet their duties of payment and performance, the underlying lawsuit would not be dismissed.

MTS failed to meet its payment obligations under the Settlement Agreement, and therefore no party has released its claims against any another.  Wagner has sought enforcement of the Settlement Agreement as to MTS.  On October 1, 2008, this Court adopted the proposed findings and recommended disposition by Magistrate Judge Richard Puglisi and granted Wagner's motion to enforce the Settlement Agreement.  That Order is effectively a judgment in favor of Wagner against MTS and is now subject to MTS' bankruptcy proceeding.  Conversely, Wagner has not

_____

[6] The Settlement Agreement contains a choice of law provision stating that it will be governed by New Mexico law.

sought enforcement of the Settlement Agreement as to Benore, presumably because Benore had no responsibilities under the agreement other than to drop its own claims once the other two parties completed their transaction.  Instead, Wagner is pursuing a claim against Benore for breach of the Project Charter, the underlying contract between Wagner and Benore.

Benore argues that, based on the doctrine of election of remedies, Wagner has no right to pursue its claims against Benore because it chose to no longer litigate when it sought enforcement of the Settlement Agreement.  The doctrine of election of remedies requires a plaintiff to choose between different remedies allowed by law upon the same set of facts.  *Jones v. Winn-Dixie Greenville, Inc.*, 318 S.C. 171, 175, 456 S.E.2d 429, 431 (Ct. App. 1995). Within this context, the facts refer to the defendant's wrongs or actions, so that when a plaintiff asserts only one primary wrong committed by the defendant, the plaintiff is entitled to only one recovery under the doctrine. *Id*.  Therefore, the doctrine has no application when two separate causes of action exist based on different facts.  *Id*.  Application of the doctrine should be confined to cases in which double compensation to the plaintiff is threatened.  *Tomlinson v. Mixon*, 367 S.C. 467, 470-471, 626 S.E.2d 43, 44-45 (2006).

In support of its argument that Wagner's claim against it is barred by election of remedies, it cites *W.T. Ferguson Lumber Co. v. Elliott*, 171 S.C. 455, 460, 172 S.E. 616, 618 (1934), in which the court stated, "[o]n the breach of a contract for compromise which has been partly performed the remedy is an action on the contract for damages for the portion remaining unperformed, and the party cannot repudiate the contract and rely on the original cause of action."  In other words, once a settlement agreement has been entered into and subsequently breached, one's remedy against the breaching party is enforcement of the settlement agreement, not enforcement of the original contract. *Id*.  Benore cites authority from the Tenth Circuit, the Supreme Court of Idaho, and the Restatement

(Second) of Contracts to similar effect.  However, all of the authorities that Benore cites are distinguishable.  None of them addresses the situation presented here, where the party seeking to enforce a settlement agreement is, in some sense, a third party beneficiary to that agreement who has no obligation to do anything other than release claims and be released, contingent upon certain actions by other parties to the agreement.  There is no way to "enforce" the Settlement Agreement as to Benore because, due to no fault of Benore's, the preconditions to Benore's performance have not been met.  As a result, under the plain terms of the Settlement Agreement, Benore is neither subject to the obligations (release of its claims against the other parties) nor entitled to the benefits (release of Wagner's claims against Benore) of the Settlement Agreement.  In contrast, the authorities cited by Benore all deal with situations involving two-party settlement agreements in which one party fails to meet its settlement obligations.  In those situations, the non-breaching party's remedy is enforce the settlement agreement as against the breaching party.  Benore's cited authorities simply do not address the situation presented here.

The Court agrees with Wagner that, based upon the plain language of the Settlement Agreement, Benore was well aware that it would not receive the benefit of that agreement in the event that either MTS or Wagner failed to meet its obligations.  That was a risk that Benore took in executing the Settlement Agreement.  Furthermore, the Court disagrees with Benore that enabling Wagner to pursue its breach of contract claim against Benore will somehow entitle Wagner to a double recovery.  What Wagner seeks is monetary damages.  It will have to prove by a preponderance of the evidence that it is entitled to such damages, and certainly any award that it receives may be offset against a possible recovery in another venue, such as the bankruptcy court.  Conversely, if Wagner obtains compensation in the bankruptcy proceeding, that award could offset any damages Wagner might be entitled to receive from Benore in this case.  Based on all of the

23

foregoing, the Court concludes that Benore is not entitled to summary judgment based on a theory of election of remedies.

It strikes the Court that what may be relevant is the impossibility of performance of the prerequisites under the Settlement Agreement that are necessary to the release of pre-existing contractual claims against Benore.  Here, it would appear that the prerequisite payment by MTS to Wagner of $558,970.22 was not only unsatisfied, but may now be impossible due to MTS' bankruptcy.  Under New Mexico law, the doctrine of impracticability, which is sometimes referred to as impossibility, applies in situations where performance by a party "is made impracticable without his fault by the occurrence of an event[,] the non-occurrence of which was a basic assumption on which the contract was made."  *In re Estate of Duncan*, 2002-NMCA-069, ¶ 27, 132 N.M. 426, 50 P.3d 175 (quoting Restatement (Second) of Contracts § 261 (1979)), *rev'd on other grounds by Estate of Duncan v. Kinsolving*, 2003-NMSC-013, 133 N.M. 821.  Essentially, Wagner is arguing impossibility as a defense to the claim that it is bound by the Settlement Agreement—that it is not bound by the Settlement Agreement because, due to MTS' bankruptcy, its prerequisites cannot be performed and the releases of underlying contractual claims cannot take place.  In order for Wagner to assert this defense, the condition creating the impossibility must have arisen through no fault of Wagner.  *Summit Properties, Inc. v. Pub. Serv. Co. of N.M.,* 2005-NMCA-090 at ¶ 32, 138 N.M. 208 (citing *Kama Rippa Music, Inc. v. Schekeryk*, 510 F.2d 837, 842 (2d Cir. 1975) (noting that party pleading defense of impossibility must show that "it took virtually every action within its powers to perform its duties under the contract")).  An impracticability defense requires a showing by Wagner that (1) a supervening event made performance on the contract impracticable, (2) the non-occurrence of the event was a basic assumption on which the contract was based, (3) the occurrence of the event was not Wagner's fault, and (4) Wagner did not assume the risk of the

occurrence.  *Summit Properties*, 2005-NMCA-090 at § 32 (citing *Seaboard Lumber Co. v. United States*, 308 F.3d 1283, 1294-95 (Fed. Cir. 2002).

     The defense of impracticability is one that has not been briefed by the parties, and therefore the Court concludes that it would be inappropriate to rule on it here.  Provided that it is properly raised, that issue, like the other issues discussed herein, must await resolution at trial in August.

     **IT IS THEREFORE ORDERED** that Defendant Benore Logistic Systems, Inc.'s *Motion for Summary Judgment* [Doc. No. 83] is **DENIED**.



_____
**UNITED STATES DISTRICT JUDGE**